UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____
                                        :
LENROY LAURANCE,                        :
                                        :
        Petitioner,                     :   Civ. No. 18-17522 (NLH)
                                        :
    v.                                  :   OPINION
                                        :
BRUCE DAVIS, et al.,                    :
                                        :
        Respondents.                    :
_____:

APPEARANCES:
Lenroy Laurance
000407603-E/721751
New Jersey State Prison
PO Box 861
Trenton, NJ 08625

        *Petitioner Pro se*

Lachia L. Bradshaw, Burlington County Prosecutor
Alexis R. Agre, Assistant Prosecutor
Burlington County Prosecutor's Office
Courts Facility – 2nd Floor
49 Rancocas Road
P.O. Box 6000
Mount Holly, NJ 08060

        *Counsel for Respondents*

HILLMAN, District Judge

    Before the Court is Petitioner Lenroy Laurance's second

amended petition for writ of habeas corpus under 28 U.S.C. §

2254.  ECF No. 6.  Respondents oppose the petition.  ECF No. 11.

For the reasons that follow, the Court will deny the petition.

A certificate of appealability will not issue.

I.  BACKGROUND

The facts of this case were recounted below and this Court, affording the state court's factual determinations the appropriate deference, 28 U.S.C. § 2254(e)(1), reproduces the recitation of the facts as set forth by the New Jersey Superior Court Appellate Division in its opinion denying Petitioner's direct appeal:

> On Sunday morning, August 30, 2009, defendant, [Marcus] White, [Shaniqua] Williams and [Baquea] Thomas were returning to Philadelphia from New York City on the New Jersey Turnpike in a rented car when White, who was driving, struck another car.  The other driver summoned police, and before they arrived, defendant and White placed two handguns in Williams's purse.  White told Williams and her sister to leave the scene and meet the two men later at a designated place the men would provide by phone.

> Williams and her sister left, however, Williams became scared and dropped the purse in some bushes on the side of the road.  When Williams and her sister later rejoined the men, White was displeased that Williams had thrown the guns away, and White and defendant both told Williams that they had to go back and retrieve the weapons.  After an unsuccessful attempt to find the guns later on Sunday, on either Monday or Tuesday, defendant, White and Williams took a bus to New York City and met a friend of defendant, who drove them to various locations along the Turnpike.   Their   search   for   the   weapons   was unsuccessful.

> Meanwhile, [Kareem] Harrison, a self-acknowledged drug dealer, stole two handguns from another drug dealer in Philadelphia, brought them home and gave them to defendant and White.  On Wednesday morning, September 2, 2009, defendant awakened Harrison and told him that they were going "to go do something," which Harrison understood to mean they were going to rob someone. Harrison woke [Robby] Willis, who agreed to join.

Armed with handguns, defendant, Willis, and Harrison left the house on foot seeking to rob someone and steal a car so they could return to search for the guns discarded by Williams.  The men saw [Lyudmila] Burshteyn sitting in her car that was parked on the street.  After circling around the car so they could approach from the rear, defendant opened the passenger-side door, and at gunpoint ordered Burshteyn not to move.  When she screamed, Willis pulled Burshteyn out of the car and threw her onto the floor of the rear seat.  Defendant drove the car to the corner and picked up Harrison, who was acting as lookout, while Willis sat in the rear.

Burshteyn pleaded for the men to take anything they wanted but not hurt her.  Willis pistol-whipped her after she refused to remain quiet and threw a dark cloth over her head.  Defendant took cash and credit cards from Burshteyn's purse and announced they were going to use the car to search for the lost handguns on the Turnpike before disposing of it at a "chop shop" he knew of in South Carolina.

Defendant drove back to the house and ran inside to get White.  Williams heard him nervously tell White to hurry up and get dressed because "we got somebody in the car." The two men left the house and joined Harrison and Willis in the car, and together, the four left for New Jersey to search for the discarded handguns.  Burshteyn was still captive on the floor of the back seat.

When Burshteyn complained that she had asthma and could not breath because of marijuana smoke in the car, defendant responded in a loud voice, "she's going to die anyway."  Defendant drove the car in an unsuccessful search for the two handguns, and, according to Harrison, defendant said "he was going to kill [Burshteyn]."

As documented by EZ-Pass records for Burshteyn's car, at 1:49 p.m., defendant exited the Turnpike.  According to Harrison, defendant drove to a remote area near an open field and some woods and said, "I'm gonna leave the girl right here."  Defendant exited the car, while Willis tightly taped the cloth that had been resting loosely on Burshteyn's head so that she could not see.  Defendant pulled her from the car and told her that she was in front of her house.

Defendant approached Harrison and asked to use his .22 caliber handgun because it would make the least amount of noise. Defendant then walked Burshteyn a few yards into the woods, placed the barrel of the gun against the left side of her wrapped head and fired one shot. Burshteyn fell, and the men re-entered the car and drove away quickly.

At about 3:30 p.m., a passing motorist noticed a motionless body near the road and called police. Subsequent forensic investigation revealed that Burshteyn died from a single, small-caliber gunshot that entered her neck, severed major blood vessels and caused her rapidly to bleed to death. The medical examiner testified the wound was consistent with a .22 caliber bullet, but not a .38 or .44 caliber bullet.

Defendant and the other men drove to a restaurant in Philadelphia where it was pre-arranged they would meet Williams, his sister, [Iaeshia] Brown and Brown's child. There was not enough room for Brown and her child, so they were left behind as the others drove off. White had told Williams they were going on vacation, and she did not know the true purpose of the trip until White told her the men had killed the owner of the car, and they were going to a chop shop in South Carolina to sell the car to one of defendant's friends.

. . . . around 1:40 a.m., on September 3, 2009, defendant was driving Burshteyn's car in Summerton, South Carolina, when he was stopped for speeding. When South Carolina authorities found guns in the car and discovered it was registered to Burshteyn, all the occupants were placed in custody. Williams subsequently told the South Carolina police that the woman who owned the car was dead.

State v. Laurance, No. A-3696-11T4, 2014 WL 8481101, at *4-6

(N.J. Super. Ct. App. Div. Apr. 7, 2015).

Petitioner went to trial and was convicted of first-degree

kidnapping, N.J.S.A. § 2C:13-1(b)(1) (Count One); first-degree

felony murder during a kidnapping, N.J.S.A. § 2C:11-3(a)(3)

4

(Count Two); first-degree armed robbery, N.J.S.A. § 2C:15-1(a)(1) (Count Three); first-degree felony murder during a robbery, N.J.S.A. § 2C:11-3(a)(3) (Count Four); first-degree carjacking, N.J.S.A. § 2C:15-2(a)(4) (Count Five); first-degree felony murder during a carjacking, N.J.S.A. § 2C:11-3(a)(3) (Count Six); second-degree unlawful possession of a weapon, N.J.S.A. § 2C:39-5(b) (Count Seven); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. § 2C:39-4(a) (Count Eight); and third-degree terroristic threats, N.J.S.A. § 2C:12-3(b) (Count Nine). ECF No. 11-6. "In a bifurcated second trial that followed immediately thereafter, the jury convicted defendant of second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b) (Count Ten)." Laurance, 2014 WL 8481101, at *1. "After considering mergers, the judge sentenced defendant to an aggregate term of life imprisonment plus forty years, subject to ninety-four and one-quarter years of parole ineligibility" on December 12, 2011. Id.; ECF No. 11-6.

Petitioner filed a direct appeal with the Appellate Division. ECF No. 11-7. On April 7, 2015, the Appellate Division vacated Petitioner's certain persons conviction, Count Ten, but otherwise affirmed the convictions and sentence. Laurance, 2014 WL 8481101, at *1. It remanded to the trial court for an amended judgment of conviction. Id. The trial court issued the amended judgment of conviction on April 8,

5

2015: "Pursuant to the Appellate Division's Opinion dated April 7, 2015, the original Judgment of Conviction is amended to vacate the conviction on Count 10 of the Indictment.  All other conditions of the Court's original Judgment of Conviction remain in effect."  ECF No. 11-15.

Petitioner filed a petition for certification with the New Jersey Supreme Court on April 23, 2015.  ECF No. 11-13.  The court denied the petition on October 9, 2015.  ECF No. 11-14; State v. Laurance, 122 A.3d 992 (N.J. 2015) (Table).  Petitioner did not submit a petition for writ of certiorari with the Supreme Court of the United States.

Petitioner filed a post-conviction relief ("PCR") petition in the Law Division on November 23, 2015.  ECF No. 11-16.  The PCR court held oral argument on October 14, 2016 and denied the petition without an evidentiary hearing on October 20, 2016. 25T;[1] ECF No. 11-21.  Petitioner appealed on February 7, 2017.

---

[1] 1T = Motion to Suppress Transcript dated April 5, 2011; ECF No. 11-38.
2T = Motion to Suppress Transcript dated April 11, 2011; ECF No. 11-39.
3T = Rule 404 Motion Transcript dated September 8, 2011; ECF No. 11-40.
4T = Rule 404 Motion Transcript dated September 13, 2011; ECF No. 11-41.
5T = Motion Transcript dated September 15, 2011; ECF No. 11-42.
6T = Trial Transcript dated September 22, 2011, Vol. I; ECF No. 11-43.
7T = Trial Transcript dated September 22, 2011, Vol. II; ECF No. 11-44.

ECF No. 11-23.  The Appellate Division affirmed the PCR court's decision on May 9, 2018.  State v. Laurance, No. A-2290-16T1, 2018 WL 2122726 (N.J. Super. Ct. App. Div. May 9, 2018). Petitioner filed a petition for certification with the New Jersey Supreme Court on May 11, 2018, ECF No. 11-34, which the

---

8T = Trial Transcript dated September 27, 2011, Vol. I; ECF No. 11-45.
9T = Trial Transcript dated September 27, 2011, Vol. II; ECF No. 11-46.
10T = Trial Transcript dated September 28, 2011, Vol. I; ECF No. 11-47.
11T = Trial Transcript dated September 28, 2011, Vol. II; ECF No. 11-48.
12T = Trial Transcript dated September 29, 2011, Vol. I; ECF No. 11-49.
13T = Trial Transcript dated September 29, 2011, Vol. II; ECF No. 11-50.
14T = Trial Transcript dated October 4, 2011, Vol. I; ECF No. 11-51.
15T = Trial Transcript dated October 4, 2011, Vol. II; ECF No. 11-52.
16T = Trial Transcript dated October 5, 2011, Vol. I; ECF No. 11-53.
17T = Trial Transcript dated October 5, 2011, Vol. II; ECF No. 11-54.
18T = Trial Transcript dated October 6, 2011; ECF No. 11-55.
19T = Trial Transcript dated October 11, 2011; ECF No. 11-56.
20T = Trial Transcript dated October 12, 2011, Volume I; ECF No. 11-57.
21T = Trial Transcript dated October 12, 2011, Volume II; ECF No. 11-58.
22T = Trial Transcript dated October 13, 2011; ECF No. 11-59.
23T = Closing Arguments and Jury Charge Transcript dated October 13, 2011; ECF No. 11-60.
24T = Sentencing Transcript dated December 9, 2011; ECF No. 11-61.
25T = PCR Hearing Transcript dated October 13, 2016; ECF No. 11-62.

court denied on November 16, 2018, ECF No. 11-37; State v.
Laurance, 197 A.3d 674 (N.J. 2018) (Table).

Petitioner filed his § 2254 petition on December 20, 2018.
ECF No. 1.  The Court administratively terminated the petition
on December 28, 2018 as the original petition was not on the
Clerk's § 2254 form.  ECF No. 3.  Petitioner submitted his
amended petition, but it was missing Petitioner's certification
that he was aware that he "must include all the grounds for
relief from the conviction or sentence in this Petition and if
he fails to set forth all the grounds, he may be barred from
presenting additional grounds at a later date."  ECF No. 5 at 1-
2.  Petitioner submitted his second amended petition, ECF No. 6,
and the Court ordered Respondents to file an answer, ECF No. 7.

Respondents submitted their answer on July 15, 2019.  ECF
No. 11.  Petitioner filed his traverse on September 18, 2019,
ECF No. 13, and the Court granted his motion to have it filed as
within time, ECF No. 14.  On April 12, 2021, Petitioner filed a
motion to amend his traverse.  ECF No. 16.  The Court denied the
motion without prejudice because Petitioner had not submitted a
proposed amended pleading.  ECF No. 18.  Petitioner submitted
his amended traverse on June 23, 2022.  ECF No. 20.

II. STANDARD OF REVIEW

Title 28 U.S.C. § 2254 permits a federal court to entertain
a petition for writ of habeas corpus on behalf of a person in

8

state custody pursuant to the judgment of a state court "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

With respect to any claim adjudicated on the merits by a state court, the writ shall not issue unless the adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding . . . .

28 U.S.C. § 2254(d).  A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [the Court's] precedent."  Williams v. Taylor, 529 U.S. 362, 405-06 (2000).

"[A] state-court decision is an unreasonable application of clearly established [Supreme Court] precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case."

9

White v. Woodall, 572 U.S. 415, 426 (2014).  "[A]n unreasonable application of federal law," however, "is different from an incorrect application of federal law."  Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Williams, 529 U.S. at 410).

The Court must presume that the state court's factual findings are correct unless Petitioner has rebutted the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

III.  DISCUSSION

Petitioner raises the following claims for this Court's review:[2]

I.   The Defendant's Motion that the Trial Court lacked territorial jurisdiction should have been granted.

II.  The Defendant's five (5) hour statement to the police admitted into evidence violated his rights under the United Staters [sic] and New Jersey Constitutions.

III. The admission of other crime evidence was grossly prejudicial and denied Defendant a fair trial.

IV.  The admission of testimony from the Attorney for the cooperating witness regarding his representation of him in this matter was irrelevant, grossly prejudicial and constituted error necessitating a new trial.

V.   The overzealousness of the prosecutor from his opening statement to his remarks at sentencing denied Defendant a fair trial.

---

[2] The second amended petition puts all of these claims into one paragraph under each "Ground" and are repeated verbatim throughout.  See ECF No. 6 at 7-14.  The Court has separated and renumbered the claims for clarity.

VI.   The proofs presented before the jury were insufficient to establish the offense of certain persons not to have weapons.

VII.  It was error for the sentencing court to fail to merge the of [sic] offenses of second degree robbery and aggravated assault.

VIII. The aggregate sentence imposed upon Mr. Laurance of Life imprisonment with 94½ years of parole ineligibility must be modified and reduced.[3]

IX.   The aggregate of errors denied Defendant a fair trial.

X.    The matter must be remanded for an evidentiary hearing because defendant established a prima facie case of Trial Counsel's ineffectiveness.

ECF No. 6.  The Court first considers Respondents' argument that the § 2254 is barred by AEDPA's one-year statute of limitations. ECF No. 11 at 51.  "Petitioner's conviction was made final in 2015 when the New Jersey Superior Court, Appellate Division, affirmed his convictions and sentences.  Over three years have elapsed since the final disposition of his convictions."  Id. at 53.

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposes a one-year period of limitation on a petitioner seeking to challenge his state conviction and sentence through a petition for writ of habeas corpus under §

---

[3] Alternatively stated as "The sentence is manifestly excessive and should be reduced."  ECF No. 6 at 8.

2254.  See 28 U.S.C. § 2244(d)(1).  Under § 2244(d)(1), the

limitation period runs from the latest of:

> (A) the date on which the judgment became final by the
> conclusion of direct review or the expiration of the
> time for seeking such review;
>
> (B) the date on which the impediment to filing an
> application created by State action in violation of the
> Constitution or laws of the United States is removed, if
> the applicant was prevented from filing by such State
> action;
>
> (C) the date on which the constitutional right asserted
> was initially recognized by the Supreme Court, if the
> right has been newly recognized by the Supreme Court and
> made retroactively applicable to cases on collateral
> review; or
>
> (D) the date on which the factual predicate of the claim
> or claims presented could have been discovered through
> the exercise of due diligence.

28 U.S.C. § 2244(d)(1).[4]  "[F]inality for the purpose of §

2244(d)(1)(A) is to be determined by reference to a uniform

federal rule."  Clay v. United States, 537 U.S. 522, 531 (2003).

"[T]he judgment becomes final at the 'expiration of the time for

seeking such review' — when the time for pursuing direct review

in this Court, or in state court, expires."  Gonzalez v. Thaler,

565 U.S. 134, 150 (2012).

The New Jersey Supreme Court denied Petitioner's request

for certification on October 9, 2015.  ECF No. 11-14; State v.

---

[4] Petitioner's conviction became final after AEDPA's April 24,
1996 effective date; therefore, his petition is subject to its
one-year statute of limitations.

Laurance, 122 A.3d 992 (N.J. 2015) (Table).  As Petitioner did
not submit a petition for writ of certiorari with the Supreme
Court of the United States, his conviction became final once the
90-day period for filing such a petition expired.  Gonzalez, 565
U.S. at 150.  Accordingly, Petitioner's conviction became final
under AEDPA on January 7, 2016.

However, Petitioner filed a PCR petition on November 23,
2015, before his conviction became final.  ECF No. 11-16.
"AEDPA's tolling mechanism provides that '[t]he time during
which a properly filed application for State post-conviction or
other collateral review with respect to the pertinent judgment
or claim is pending shall not be counted toward any period of
limitation under this subsection.'"  Martin v. Adm'r New Jersey
State Prison, 23 F.4th 261, 268 (3d Cir. 2022) (quoting 28
U.S.C. § 2244(d)(2)) (emphasis omitted) (alteration in
original).  All of the time between the New Jersey Supreme
Court's certification denial and the PCR court's October 20,
2016 decision was tolled under § 2244(d)(2).  The PCR petition
remained "pending" for 45 days following the PCR court's
decision, i.e., until December 5, 2016.[5]  N.J. Ct. R. 2:4-1(a);
Swartz v. Meyers, 204 F.3d 417, 421 (3d Cir. 2000) ("'[P]ending'

---

[5] December 4, 2016 was a Sunday.  Fed. R. Civ. P. 6(a)(1)(C).

includes the time for seeking discretionary review, whether or not discretionary review is sought.").

Petitioner did not file an appeal until February 7, 2017. ECF No. 11-23. Sixty-four (64) days ran in Petitioner's AEDPA limitations period between the last day Petitioner could have filed a timely appeal and the date on which he ultimately filed his appeal. See Martin, 23 F.4th at 271 ("In other words, from the expiration of time in which to file a timely appeal and the state court's acceptance of the belated appeal, there is no PCR petition for the state court system to consider."). Petitioner had 301 days remaining to file a timely § 2254 petition.[6]

Section 2244(d)(2) tolled the time again between February 7, 2017 and November 16, 2018 while Petitioner's PCR appeals were pending before the Appellate Division and New Jersey Supreme Court. Petitioner filed his original petition on December 20, 2018, well within the remaining 301 days. The Court therefore concludes the petition is timely and will proceed to the merits.

A.   Territorial Jurisdiction

Petitioner argues his constitutional rights to a fair trial and to due process were violated when the trial court denied his

---

[6] 365 – 64 = 301.

motion to dismiss certain offenses for lack of jurisdiction.

The Appellate Division rejected this argument on direct appeal.

> Defendant concedes that territorial jurisdiction to
> prosecute the crimes of kidnapping, felony murder during
> a kidnapping, and the weapons offenses lay in New Jersey.
> He argues that the other crimes — armed robbery, felony
> murder during a robbery, carjacking, felony murder
> during a carjacking, and terroristic threats — were
> committed and completed in Pennsylvania, and, therefore,
> New Jersey lacked jurisdiction.
>
> . . . .
>
> During his opening statement, the prosecutor briefly
> alluded to the fact that Burshteyn was "originally taken
> off the street in Philadelphia," but referencing "dual
> sovereignty," he told the jury that New Jersey was the
> "right place" to try defendant for the crimes charged in
> the indictment.  Except for those comments, there was no
> mention of territorial jurisdiction throughout the trial
> until defendant's sentencing allocution.  In short,
> "territorial jurisdiction was not clearly in dispute."
>
> Furthermore, we are convinced there was proof beyond a
> reasonable doubt that all the crimes "occurred within"
> New Jersey.

Laurance, 2014 WL 8481101, at *6-7 (quoting State v. Denofa, 898

A.2d 523, 535 (N.J. 2006)).

Under New Jersey law, "territorial jurisdiction is an

element of murder and, on defendant's request, must be submitted

to the jury if there is a legitimate factual dispute concerning

the location of the crime."  Denofa, 898 A.2d at 530.  "Without

a request, the trial court is required to charge territorial

jurisdiction only if the record clearly indicates a factual

dispute concerning where the crime occurred."  Id.  The

15

Appellate Division concluded that "territorial jurisdiction was not clearly in dispute" during Petitioner's trial; therefore, the Appellate Division found that state law did not require the trial court to instruct the jury on territorial jurisdiction.

"The United States Supreme Court and the Third Circuit have made clear that it is not the role of the federal courts to review state court jury instruction rulings that are based on state law." Howard v. D'Ilio, No. 14-4758, 2018 WL 1014168, at *5 (D.N.J. Feb. 22, 2018).  This Court's "habeas review of jury instructions is limited to those instances where the instructions violated a defendant's due process rights." Echols v. Ricci, 492 F. App'x 301, 312 (3d Cir. 2012) (citing Estelle v. McGuire, 502 U.S. 62, 72–73 (1991)).  "A defendant's due process rights are violated, in turn, only where the instruction 'operated to lift the burden of proof on an essential element of an offense as defined by state law.'" Id. quoting (Smith v. Horn, 120 F.3d 400, 416 (3d Cir. 1997)).  "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." Henderson v. Kibbe, 431 U.S. 145, 155 (1977).  Moreover, failure to submit an element of a crime to a jury is subject to a constitutional harmless error analysis. See Neder v. United States, 527 U.S. 1 (1999); Denofa v. D'Ilio, No. 13-7830, 2017 WL 2829600, at *8 (D.N.J. June 30, 2017) ("Because the analysis undertaken by the New Jersey Supreme

16

Court in Petitioner's direct appeal mirrors the Neder harmless
error analysis, there is no basis for federal habeas relief
here."). "[A] state prisoner seeking to challenge his
conviction in collateral federal proceedings must show that the
error had a 'substantial and injurious effect or influence' on
the outcome of his trial." Brown v. Davenport, 142 S. Ct. 1510,
1519 (2022) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637
(1993)). "[A] a federal court cannot grant habeas relief unless
a state prisoner . . . satisfies both this Court's equitable
precedents and Congress's statute." Id. at 1531.

The Court concludes that the state court did not reach a
decision that was contrary to or an unreasonable application of
established federal law, and that its conclusions are reasonable
in light of the facts at trial. The Appellate Division found
territorial jurisdiction over the robbery and carjacking
offenses because each statute includes acts occurring during
"immediate flight." Laurance, 2014 WL 8481101, at *8. See
N.J.S.A. § 2C:15-1(a)(1) ("An act shall be deemed to be included
in the phrase 'in the course of committing a theft' if it occurs
in an attempt to commit theft or in immediate flight after the
attempt or commission."); N.J.S.A. § 2C:15-2(a)(4) ("An act
shall be deemed to be 'in the course of committing an unlawful
taking of a motor vehicle' if it occurs during an attempt to

17

commit the unlawful taking of a motor vehicle or during an
immediate flight after the attempt or commission.").

> Whether an act occurs during "immediate flight" hinges
> upon whether the actor has reached a point of at least
> temporary safety or is in custody.

> . . . .

> Simply put, when defendant drove into New Jersey with
> the proceeds of the robbery in his possession and
> Burshteyn captive inside her vehicle, he had not reached
> a point of safety, and his flight from the theft that
> originated in Pennsylvania continued.

Laurance, 2014 WL 8481101, at *8. "Pursuant to N.J.S.A. 2C:11-
3(a)(3), 'criminal homicide constitutes murder when ... [i]t is
committed when the actor ... is engaged in the commission of ...
or flight after committing ... robbery ... [or] carjacking.'  It
is undisputed that Burshteyn was killed in New Jersey, and for
the reasons already expressed, there was sufficient evidence to
prove defendant committed felony murder in New Jersey."  Id.
(omissions and alterations in original).  "Lastly, N.J.S.A.
2C:12-3(a) provides that a 'person is guilty of a crime of the
third degree if he threatens to commit any crime of violence
with the purpose to terrorize another.'  There was direct
evidence that while defendant was in Burshteyn's car in New
Jersey, he threatened to kill her."  Id. at *8-9.

Petitioner has not shown that the Appellate Division's
decision was contrary to or an unreasonable application of
established federal law.  Nor has he shown that its conclusions

are unreasonable considering the facts at trial.  The Court will deny habeas relief on this claim.

B.   Violation of Right to Counsel

Petitioner next asserts that his statement to police was admitted at trial in violation of his right to counsel. "Despite Mr. Laurance's unequivocal request several times for counsel, the police questioning continued for 5 hours.  A majority of this statement was played for the jury and utilized by the state to challenge defendant's credibility.  Mr. Laurance did not testify at trial."  ECF No. 20 at 15.  The state courts considered this claim on its merits.

"The Sixth Amendment right to counsel attaches only at the initiation of adversary criminal proceedings, and before proceedings are initiated a suspect in a criminal investigation has no constitutional right to the assistance of counsel." Davis v. United States, 512 U.S. 452, 456–57 (1994) (internal citation omitted).  "Nevertheless, we held in Miranda v. Arizona, 384 U.S. 436, 469–473 (1966), that a suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning, and that the police must explain this right to him before questioning begins."  Id. at 457.  "If the suspect effectively waives his right to counsel after receiving the Miranda warnings, law enforcement officers are free to question him.

19

But if a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." Id. at 458.

Detective Robert Hageman from the Burlington County Prosecutor's Office interviewed Petitioner in South Carolina on September 5, 2009:

> [Hageman]:     In order for me to have a conversation with you, I have to read you your Miranda warnings.  Everybody has to do it; it, um, allows me to have a conversation with you, to, um, tell you what's going on, and for you to tell me what's going on. Without reading this, I can't talk to you.  By reading this and getting past this, it allows us to move forward and I can let you know what's
>
> [Petitioner]:  They're
>
> [Hageman]:     going on.
>
> [Petitioner]:  My rights, right?
>
> [Hageman]:     They're your rights.
>
> [Petitioner]:  My right to remain silent.
>
> [Hageman]:     I'm going to read them.  Alright?  I'm going to read them from a card, so there's no confusion. If you don't understand it, you tell me.
>
> [Petitioner]:  I know everything that's on that card already, do you have to read it?
>
> [Hageman]:     I do.  You've been read these before?
>
> [Petitioner]:  Yeah.

> [Hageman]:        Alright. I'm gonna read 'em; it'll take
>                   two minutes.

> [Petitioner]:  Ok.

ECF No. 11-38 at 3-4.  "Hageman persisted and read the card
completely before defendant answered the questions on the card
and signed his name indicating waiver of his rights." Laurance,
2014 WL 8481101, at *2.

Petitioner first referenced an attorney while telling
Detective Hageman about a conversation Petitioner had that
morning with his wife:

> I'm never seeing, basically, when my Wife told me I
> charged for murder, I be wanted for murder, I think the
> first thing I said to her, when I finally get a lawyer,
> when it takes 24 hours to go to New Jersey to find out,
> I'd never see the streets again.  Might be dumb, but I
> ain't stupid.  Like I said I might be dumb, but I'm not
> stupid.   I might be a dumb loser sit out there sell
> drugs, but I'm not stupid to go kill somebody.   If
> somebody shot me in my leg, I know where his family live
> at, I know where his girls live at, I know where his
> babies live at.  And I'd never put a hands on them. Ever
> - even go close to them.   You don't think I'm stupid
> enough to go kill a female for money.

ECF No. 11-38 at 68.  During the suppression hearing on April 5,
2011, the trial court identified Petitioner's reference to an
attorney as a "triggering statement" under Miranda.  1T54:25.

> That's where we begin the analysis.  In some senses,
> that's where we could've ended the analysis, "When I
> finally get a lawyer."  That is, to me, not in any way,
> an assertion of [Petitioner's] Miranda rights. . . .
> He's essentially recounting the conversation that he had
> with his wife where he indicates to her, "When I finally
> get a lawyer."  It's really just even a statement, as
> opposed to anything else."

21

Id. at 54:25 to 55:12.  The trial court concluded this statement
was "not ambiguous and the officer could've continued," but
recognized that "Detective Hageman did the appropriate thing
under the circumstances.  He took a step back.  He was cautious.
. . . And he went on to clarify."  Id. at 55:13-20.  After
Petitioner's "triggering statement," Detective Hageman asked
"What did you tell your wife on the phone?  About, something
about Jersey and a lawyer?  I need to clarify that."  ECF No.
11-38 at 68.  Petitioner responded:

> I'm getting me a lawyer that's in New Jersey to find out
> what's going on.  It's taking her to find me a lawyer
> that you think would get me a bail so I could come out
> and fight my case from the street, 'cause I've been in
> jail before and fighting a case from behind bars was not
> helping.  I need a good lawyer that's gonna get me bail
> and everything.  That's gonna show them that I had
> nothing to do with this murder.  I have families to back
> me up and prove where I was.  I told you where I was.  I
> told you what happened.  I told my wife everything.  I'm
> right now living this thing, myself (inaudible) you know
> what's going on.  You could have somebody be delaying my
> (inaudible) like I'm (inaudible) a little (inaudible)
> too.  Like I'm not for it, I'm not gonna go to jail for
> this.

Id.  Detective Hageman stated "Ok, so what's you're saying is
you want a lawyer to show that you didn't do this."  Id.
Petitioner replied "Point blank.  Period."  Id.  The trial court
concluded "after reading the transcript, seeing the video on now
three separate occasions, it's really very clear, in my view,
that when the defendant is saying, 'Point blank period,' he's

22

being emphatic, 'Yes, I didn't do this.  Point blank period I

didn't do this.'  He's not saying, 'Point blank period, I want a

lawyer.'  I would not, at all, go with that interpretation."

1T56:17-23.  As recounted by the Appellate Division:

> Shortly thereafter, the following exchange occurred:
>
> Hageman:   Can we continue to talk to you?
>
> Defendant: ... Why would I sit here and ... continue to
>            talk to you when ... you telling me I'm
>            lying?
>
> ....
>
> Hageman:    ... Do you want to continue to talk to me?
>
> Defendant: What do you want to continue to talk you
>            [sic] about being hurt and know that I can't
>            even go [sic] my wife tomorrow?
>
> Hageman:    ... [Y]ou're talking about a lot of things
>            ..., but I'm not sure that you want to
>            continue to talk to me because you said you
>            wanted to see if a lawyer can help you.
>
> Defendant: Do you have a lawyer present[ ] for me, that
>            can help me?
>
> Hageman:   I don't have a lawyer here for you.
>
> Defendant: ... I want to see my family. I just want to
>            see my family I want to talk to my wife. Like
>            I want to be with my family, I'm not gonna
>            go to jail for something I didn't do.
>
> A short time later, Hageman told defendant, "I can't
> talk to you anymore," to which defendant responded, "Why
> you can't talk to me anymore?" The colloquy resumed:
>
> Hageman: '[C]ause you asked if a lawyer could help you.
>
> Defendant: No, I wasn't talking to you towards that.
> Like, I told that to my wife, not to y'all.

Hageman asked again, "Do you want a lawyer here?" Defendant responded, "Can I have a lawyer present right now? How long it's gonna take for a lawyer to be present?" Hageman responded that he did not know, and after some further banter, the interview recessed for a short period.

Hageman recommenced by telling defendant, "I can't get you a lawyer here.  Do you want to talk to us without a lawyer or not?" Defendant was evasive, and Hageman again asked, "Do you want a lawyer or not?" Defendant parried, "Right now?" and then told Hageman "I don't see the reason why I need a lawyer."  Hageman persisted, "Do you want a lawyer here while we talk to you right now?  Or do you not want a lawyer. Do you want to talk to us, first of all?"  Defendant answered, "I wanna talk to y'all."  Defendant continued, "I'll talk to ya'll without a lawyer if ya'll help me."  Hageman told defendant he "can't make [him] any promises." After several more parries, defendant told Hageman, "Yes, I'll talk to you ... without a lawyer present. At this moment in time, yes, I'll talk to you." Defendant further indicated that he understood Hageman had made no promises.

Laurance, 2014 WL 8481101, at *2 (alterations and omissions in

original); see also ECF No. 11-38 at 69-74.

Clearly established federal law requires the invocation of

the Miranda right to an attorney to be unambiguous.  Davis v.

United States, 512 U.S. 452, 459 (1994).  "[T]his is an

objective inquiry."  Id.  "[I]f a suspect makes a reference to

an attorney that is ambiguous or equivocal in that a reasonable

officer in light of the circumstances would have understood only

that the suspect might be invoking the right to counsel, our

precedents do not require the cessation of questioning."  Id.

(emphasis in original).  See also Berghuis v. Thompkins, 560

U.S. 370, 381 (2010) ('If an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her <u>Miranda</u> rights.").  "As we have observed, 'a statement either is such an assertion of the right to counsel or it is not.'"  <u>Davis</u>, 512 U.S. at 459 (quoting <u>Smith v. Illinois</u>, 469 U.S. 91, 97-98 (1984) (per curiam)).

Here, the state courts reasonably concluded that Petitioner did not clearly and unambiguously invoke his right to have an attorney present during the interrogation.  Petitioner first mentioned having an attorney in the context of recounting his conversation with his wife: "when my Wife told me I charged for murder, I be wanted for murder, I think the first thing I said to her, when I finally get a lawyer, when it takes 24 hours to go to New Jersey to find out, I'd never see the streets again."  ECF No. 11-38 at 68.  This is not an unambiguous request to have an attorney present for the interrogation.  <u>See</u> <u>Davis</u>, 512 U.S. at 462 (holding defendant's remark that "Maybe I should talk to a lawyer" was not a request for counsel requiring officer to stop the interrogation).  It was reasonable for the trial court to interpret this as a statement regarding potentially hiring an attorney at some undefined future point in time.  <u>See</u> <u>United States v. Hill</u>, 575 F. Supp. 3d 185, 195 (D.D.C. 2021)

("Statements like 'I would feel more comfortable with a lawyer' or 'I think I should get a lawyer' are better characterized as musings or deliberations than as unequivocal expressions of the right to counsel.").

Petitioner asserts he told the officers he did not want to speak with them: "The investigator then asks Mr. Laurance if he wanted a lawyer or want to talk to them first.  Defendant's response was 'I don't want to talk to you.'"  ECF No. 20 at 15 (citing appellate brief, ECF No. 11-7 at 31).  The revised transcript of the interrogation indicates Petitioner answered "'I want to talk to you all'" when Detective Hageman asked "'Do you want a lawyer here while we talk to you right now?  Or do you not want a lawyer.  Do you want to talk to us, first of all?'"  ECF No. 11-4 at 72.  The trial court and Appellate Division relied on the recording of Petitioner's statement and the revised transcript in concluding the revised transcript accurately reflected Petitioner's statement.  See Laurance, 2014 WL 8481101, at *2 ("Hageman persisted, 'Do you want a lawyer here while we talk to you right now?  Or do you not want a lawyer.  Do you want to talk to us, first of all?'  Defendant answered, 'I wanna talk to y'all.'").

"In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a

State court shall be presumed to be correct."  28 U.S.C. §
2254(e)(1).  "The applicant shall have the burden of rebutting
the presumption of correctness by clear and convincing
evidence."  Id.  The record supports the state courts'
conclusions, and Petitioner has not submitted clear and
convincing evidence to rebut the presumption of correctness.
Accordingly, the Court is bound by the state courts' finding on
this dispute.

    Considering the facts as determined by the state courts,
the opinions were neither contrary to nor an unreasonable
application of clearly established federal law.  Davis requires
an unambiguous assertion of a Miranda right before law
enforcement is required to cease questioning a suspect.  The
state courts identified the correct governing law, and their
conclusion that Petitioner did not clearly and unambiguously
invoke his right to counsel was a reasonable application of
Miranda and Davis.  Even if Petitioner's statements could be
considered ambiguous requests for counsel, federal law does not
require police officers to clarify an ambiguous request for
counsel before continuing an interrogation.  Davis, 512 U.S. at
459.  Additionally, the state courts' decisions were not "based
on an unreasonable determination of the facts in light of the
evidence presented in the State court proceeding."  28 U.S.C. §

2254(d)(2).  Therefore, Petitioner is not entitled to habeas relief on this claim.[7]

C.    Admission of Other Crime Evidence

Petitioner challenges the admission of alleged other crimes evidence, namely "testimony by [co-participant, Kareem Harrison] that (1) he stole guns from a drug dealer; (2) the defendants wanted the lost guns back to rob more people; (3) defendant purchased marijuana for the group following the murder and; (4) defendant threatened to kill him in Philadelphia."  ECF No. 20 at 18 (internal citations omitted).  He also challenges his girlfriend Keneshia Wilson's testimony "consist[ing] of the contents of letters purportedly sent by defendant haranguing her for 'snitching' on him and threatening bodily harm."  Id.  "None of this criminal conduct was charged in the indictment. Addicted [sic] purportedly to show consciousness of guilt and state of mind, the testimony was clearly grossly prejudicial and

---

[7] Petitioner argues in one sentence that his "request to speak with his wife also should have ceased police questioning."  ECF No. 20 at 17 (citing State v. Harvey, 121 N.J. 407, 419 (1990)). The Appellate Division concluded this was meritless under state law.  Laurance, 2014 WL 8481101, at *3-4.  "[A]n accused who wants to invoke his or her right to remain silent [must] do so unambiguously."  Berghuis v. Thompkins, 560 U.S. 370, 381 (2010).  Moreover, Petitioner points to no federal rule that requires officers to stop questioning a suspect who asks to speak with their spouse.  See In re Terrorist Bombings of U.S. Embassies in E. Afr., 552 F.3d 177, 212 (2d Cir. 2008) ("Miranda does not require that a suspect be informed that he may delay questioning, obtain assistance from his consulate, or contact his wife . . . .").  There is no merit to this claim.

should have been excluded from evidence." Id. (internal citations omitted).

Petitioner argues the admission of this evidence violated New Jersey Evidence Rule 404(b). Id. at 19. This argument lacks merit. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67–68 (1991). Even if the admission of the testimony violated New Jersey's evidence rules, "'federal habeas corpus relief does not lie for errors of state law.'" Id. at 67 (quoting Lewis v. Jeffers, 497 U.S. 764, 780 (1984)).[8] "Admission of 'other crimes' evidence provides a ground for federal habeas relief only if 'the evidence's probative value is so conspicuously outweighed by its inflammatory content, so as to violate a defendant's constitutional right to a fair trial.'" Bronshtein v. Horn, 404 F.3d 700, 730 (3d Cir. 2005) (quoting Lesko v. Owens, 881 F.2d 44, 52 (3d Cir. 1989)).

---

[8] Petitioner presented both state and federal arguments to the Appellate Division, but the Appellate Division rejected Petitioner's arguments under state law and did not address his federal claim. "When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits[.]" Johnson v. Williams, 568 U.S. 289, 301 (2013). The Court therefore applies the appropriate AEDPA deference.

1.   Testimony of Kareem Harrison

The trial court considered the admissibility of Harrison's statement about his firearm acquisition at a pre-trial hearing. See 3T & 4T.  "Harrison testified at the hearing that he stole two handguns from a drug dealer a day or two before the murder and gave them to defendant and Willis."  Laurance, 2014 WL 8481101, at *9.  "The judge rejected defendant's argument that the testimony was inadmissible under Rule 404(b), concluding instead that the evidence was intrinsic to the charged crimes, in particular, the weapon-possession charges contained in the indictment, and was therefore admissible."  Id.  The Appellate Division agreed, stating "[t]he trial judge's reasoning was spot-on as to Harrison's testimony regarding the two guns.  That was intrinsic evidence since, at the least, defendant was charged with possessory crimes regarding those specific weapons."  Id. at *10.[9]

Petitioner has not "overcome his burden of identifying facially contradictory Supreme Court precedent, or precedent that obviously forbids the admission of" Harrison's testimony.

_____

[9] "[E]vidence is intrinsic if it 'directly proves' the charged offense. . . . If uncharged misconduct directly proves the charged offense, it is not evidence of some 'other' crime." United States v. Green, 617 F.3d 233, 248-49 (3d Cir. 2010). Additionally, "'uncharged acts performed contemporaneously with the charged crime may be termed intrinsic if they facilitate the commission of the charged crime.'"  Id. at 249 (quoting United States v. Bowie, 232 F.3d 923, 929 (D.C. Cir. 2000)).

_Allison v. Superintendent Waymart SCI_, 703 F. App'x 91, 97–98
(3d Cir. 2017).  The Supreme Court has "defined the category of
infractions that violate 'fundamental fairness' very narrowly."
_Dowling v. United States_, 493 U.S. 342, 352 (1990).  "In
_Dowling_, evidence that the defendant had donned a mask and used
a gun to rob a home was admitted to show that he wore a similar
mask and used a similar gun to rob a bank two weeks later."
_Allison_, 703 F. App'x at 98.  The Supreme Court upheld the
testimony's admission because it "was at least circumstantially
valuable in proving petitioner's guilt."  _Dowling_, 493 U.S. at
353.

Here, Harrison's testimony about the handguns provided
evidence that Petitioner had control over the weapons forming
the basis of Count Seven's unlawful possession charge.  ECF No.
11-3 at 10.  Harrison identified two handguns as being ones that
he stole from a drug dealer's car, 10T165:15 to 167:5, and he
testified that Petitioner and White took the handguns from him
approximately two days before Burshteyn's murder, 10T:171:21 to
173:16.  Harrison confirmed these two guns were hidden in a
potato chip bag along with Harrison's .22 after South Carolina
police pulled over Petitioner, who was driving Burshteyn's car,
on September 3, 2009.  12T46:4-9, 48:5 to 49:22.  South Carolina
police found all three handguns during their search.  14T166:20
to 167:5, 173:20-21, 174:20-23.  Harrison's testimony showed the

origin of the weapons and how they came to be in Petitioner's possession.  See United States v. O'Leary, 739 F.2d 135, 136 (3d Cir. 1984) (agreeing the need "to show the background of the charges" was a "permissible purpose for admission" under Rule 404(b) (quotation marks omitted)).

Similarly, Harrison's testimony about stopping to purchase marijuana was directly relevant to the terroristic threats charge.  Harrison testified that Petitioner stopped to purchase marijuana while Burshteyn on the floor of the back seat of her car.  11T229:10-17.  Burshteyn called out that she could not breathe due to the marijuana smoke because she had asthma.  11T229:19-25.  Harrison testified that Burshteyn "was choking and I said she can't breathe, she can't breathe.  [Petitioner] said, oh, she's going to die anyway."  11T247:21-23.  "Mrs. Burshteyn was lying on the floor of the SUV directly under Harrison's feet when petitioner said this.  Harrison heard petitioner's threat and his intended victim must have heard it, too."  ECF No. 11 at 92.  Petitioner has not shown how evidence that he purchased a small amount of marijuana unfairly prejudiced his right to fair trial.

There is also no evidence from which the Court could conclude that Harrison's testimony about Petitioner's alleged motivation to find the lost guns violated fundamental fairness.  Harrison told the jury that he overheard Petitioner and White

talk about how they had recently lost guns on the highway when White "fell asleep behind the wheel and they got in an accident and they gave the guns to Shaniqua to hide them on the highway." 10T163:8-10.  He stated he overheard Petitioner and White talking about needing to find the guns "so they can have more people."  10T163:14-21.  As the Appellate Division noted, this testimony "was ambiguous at best.  The prosecutor never asked [Harrison] to explain the meaning of the phrase, and its admission was not plain error."  Laurance, 2014 WL 8481101, at *10.  The testimony explains why Petitioner and everyone set out on September 2, 2009, and any prejudicial effect of that brief, ambiguous remark cannot be said to "so conspicuously outweigh" the probative value of the testimony.  Bronshtein v. Horn, 404 F.3d 700, 730 (3d Cir. 2005).

Petitioner's final claim of error with Harrison's testimony is that Harrison was permitted to testify that Petitioner threatened to shoot him.  This claim is equally without merit. Petitioner's trial counsel elicited this testimony during Harrison's cross-examination:

> [Trial Counsel]: Now, there came a time at the house on Helen Street where you got angry with [Petitioner] too, didn't you?
>
> [Harrison]:     Yes.
>
> [Trial Counsel]: And you were angry with him to such an extent you didn't like him, did you?

33

[Harrison]:        No.

[Trial Counsel]: Now, do you recall the reason why you
                 got angry with him?

[Harrison]:        Because he threatened to shoot me.

[Trial Counsel]: He threatened to shoot you?

[Harrison]:        Yes.

[Trial Counsel]: Okay.  Now, did he just out of the blue
                 say to you, Mr. Harrison, I think I'm
                 just going to shoot you?

[Harrison]:        No. I said I get mad, I stole these
                   guns for nothing and I ain't done
                   nothing with them so I'm gonna shoot my
                   .22 up in the air.  And he said if you
                   shoot your .22 up in the air, I'm gonna
                   shoot you.

12T113:7-25].  At sidebar, the trial court warned trial counsel

not to "go any further than you are right now or you're going to

get into the area of the robberies that I specifically

precluded."  12T115:15-17.  Trial counsel argued the testimony

was necessary as it was "the cause of the antipathy [Harrison]

had towards [Petitioner]."  115T8-9.  See also 12T116:9-12

("[T]he issue is [Harrison] said he was mad at this man, he had

bias against this man, he had anger directed against this man

and the issue was about the guns . . . .");  12T119:7-9 ("The

issue is — the answer is that [Harrison] was mad at [Petitioner]

because he threatened to shoot him.  That's the basis of his

bias.").  Trial counsel brought up Petitioner's threat to shoot

Harrison as evidence that Harrison was biased against

34

Petitioner, and the State was permitted to address this argument during its redirect examination of Harrison.  12T144:5 to 145:4.

Petitioner has not presented any evidence to suggest that that the admission of Harrison's testimony violated his constitutional right to a fair trial.  See Bronshtein v. Horn, 404 F.3d 700, 730 (3d Cir. 2005).  The Court will deny habeas relief on this claim.

2.   Testimony of Keneshia Wilson

Petitioner further argues he was prejudiced by his ex-girlfriend's testimony about letters he sent to her while incarcerated before trial.  "As petitioner's trial for the murder of Lyudmila Burshteyn drew closer, petitioner wrote increasingly threatening letters to his ex-girlfriend Kenesha Wilson in a failed attempt to force her to contact his attorney, retract her statement to the police, and corroborate his fabricated alibi."  ECF No. 11 at 94.  "Excerpts of these letters were read into evidence during Kenesha's testimony." Id. (citing 6T165:8 to 166:24, 177:15 to 184:6; ECF No. 11-9 at 68-94).  "[P]etitioner's escalating threats of violence to Kenesha were written close in time to trial and were directly related to his prosecution for Mrs. Burshteyn's murder.  Kenesha recognized petitioner's handwriting on each letter and there was no dispute at trial that petitioner was the author of the

35

letters read to the jury." Id. at 95 (internal citations omitted).

The Appellate Division reasonably concluded this testimony did not violate Petitioner's fair trial rights. "Wilson's testimony and the letters were plainly relevant of defendant's guilty conscience. . . . [T]he letters, hand-written by defendant, were clear and convincing evidence of his attempts to intimidate Wilson." Laurance, 2014 WL 8481101, at *11. The trial court issued a limiting instruction after the letters were read, directing the jury that the evidence "is permissible for you to utilize for your consideration only for a limited purpose and that purpose is to consider the defendant's state of mind as it may relate to his consciousness of his own guilt and not that he has a propensity to commit crimes or that he is in fact a violent individual." 6T186:3-9. The instruction was repeated in the final charge. 20T152:17 to 153:14. "[I]t is a basic tenet of our jurisprudence that a jury is presumed to have followed the instructions the court gave it . . . ." United States v. Givan, 320 F.3d 452, 462 (3d Cir. 2003). The state courts reasonably concluded that the evidence was highly probative of Petitioner's consciousness of guilt, and the trial court took steps to limit the prejudice to Petitioner. The Court cannot say the state courts acted unreasonably or in violation of federal law when they concluded this evidence did

not violate Petitioner's right to a fair trial.  The Court will deny habeas relief on this claim.

D.   <u>Testimony of Kevin Walker, Esq.</u>

Petitioner argues Harrison's attorney, Kevin Walker, testified inappropriately about the terms and conditions of Harrison's plea agreement.  "The testimony of the cooperating witness's attorney was both irrelevant and immaterial the case. The testimony should have been excluded under N.J.R.E. 401 and 403."  ECF No. 20 at 14.

Petitioner did not present a federal claim to the state courts, arguing "that Walker's testimony was irrelevant and prejudicial because it permitted the prosecutor to bolster the credibility of Harrison."  <u>Laurance</u>, 2014 WL 8481101, at *12. The Appellate Division agreed with Petitioner's argument and was "deeply troubled by the wholesale admission of this largely irrelevant evidence."  <u>Id.</u> at *12

> Harrison was a critical witness in the State's case, and, in large part, the thrust of the defense was that Harrison shot the victim and lied in an attempt to minimize his involvement.  Defendant was entitled to impeach Harrison's credibility by demonstrating that he pled guilty in return for a favorable plea bargain conditioned upon testifying against defendant.
>
> Harrison, who testified immediately after Walker, was questioned directly about the terms of his plea bargain, a condition of which was that he testify truthfully at trial. We assume that the purpose of Walker's testimony, at least in part, was to support Harrison's credibility, by showing the sentence bargained for was potentially not much more favorable than the probable sentence

Harrison would have received if convicted at trial.
However, the only relevant evidence was Harrison's
perception that he curried more favorable treatment by
being a State's witness against defendant.

. . . .

Walker's testimony posed the risk of substantial
prejudice. Immediately before Harrison testified, the
jury heard his experienced attorney explaining the
calculus used in offering advice to defendant's guilty
co-defendant that ultimately resulted in Harrison
pleading guilty. As the judge herself recognized when
she sustained an objection at side bar and restrained
the prosecutor from asking Walker about his assessment
of the strengths of the State's case, the prosecution's
case against defendant was "the same case" as the one
against Harrison, i.e., all four men were guilty of
felony murder. Walker's testimony had the potential to
raise in the jury's mind a dangerous, prejudicial
implication. If Harrison—who was present every step of
defendant's murderous way—pled guilty after receiving
his attorney's advice, why was defendant proceeding to
trial?

Id. (internal citations and footnote omitted). However, the

Appellate Division ultimately concluded the error was harmless.

"[T]here was only limited objection to Walker's testimony, and

when defense counsel did object, the judge sustained his

objection.[10] In summation, defense counsel used Walker's

testimony to argue that Harrison actually faced less jail time

than what he bargained for, since Walker testified that he would

---

[10] Trial counsel argued Walker's testimony was "analogous to
calling an expert witness." 10T77:19. Petitioner repeats this
argument before the Court, arguing "the State elicited testimony
about Mr. Walker's 20 years experience in criminal law, [and] no
attempt was made to qualify him as an expert even had the
testimony been relevant." ECF No. 20 at 22.

ask the judge to impose a lesser sentence on his client based upon Harrison's cooperation." Id. at *12.

As previously stated, the Court cannot grant federal habeas relief for errors of state law. Estelle v. McGuire, 502 U.S. 62, 67 (1991). It must also apply AEDPA deference to the Appellate Division's finding of harmless error. Brown v. Davenport, 142 S. Ct. 1510, 1520 (2022) ("No one questions that a state court's harmless-error determination qualifies as an adjudication on the merits under AEDPA."). Petitioner is not entitled to relief on this claim "unless the state court's rejection of his claim (1) was contrary to or involved an unreasonable application of clearly established federal law, or (2) was based on an unreasonable determination of the facts." Davis v. Ayala, 576 U.S. 257, 269 (2015).

The Appellate Division determined the admission of Walker's testimony was harmless error because it could not "ignore that defendant significantly incriminated himself in the statement he gave to Hageman, some details of which actually corroborated Harrison's testimony. Furthermore, Harrison's testimony was corroborated by other witnesses." Laurance, 2014 WL 8481101, at *13. The Court cannot say this decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court. See Brown, 142 S. Ct. at 1525 (citing 28 U.S.C. § 2254(d)(1)). The Court also

cannot conclude that the decision was based on an unreasonable determination of the facts in light of the evidence presented at trial.  Accordingly, the Court will deny relief under § 2254 for this claim.

E.   <u>Prosecutorial Misconduct</u>

Petitioner also cites to several incidents of alleged prosecutorial misconduct during his trial:

> The Prosecutor opened to the jury with a photograph of the victim and comments about the post-homicide struggles of her family.  He displayed two photographs of the defendant sitting in the back of a police car. He referred to defendant's a/k/a'-s and that he had a 16 year old girl in his car when he was arrested.  He played portions of defendant's statement to the police and all of this evidence was presented before the authentication and testimony of any witness.
>
> Although the State had objective evidence to present to prove its case, the prosecutor repeatedly went one-step too far to demonstrate Mr. Laurance was an "evil" person. This testimony consisted of 1) the specific contexts of the letters to Ms. Wilson; 2) the presentation of the testimony of the cooperating witnesses' attorney; 3) presentation of other crime evidence; 4) questions to the victim's associate as to whether he ever met her grandchild; 5) testimony at trial that defendant told police he had been read his <u>Miranda</u> rights before that day; 6) testimony that the defendant's statement to the police admitted into evidence was only 60% of the whole; 7) the police locate defendant's girlfriend in law enforcement database; 8) In summation asserting that the defense conceded felony murder and New Jersey had dual sovereignty in the case; 9) post-verdict, presenting a case before the jury for charge of certain persons not to have weapons without a certified copy of conviction; and 10) at sentence, presenting a video of the victim "without music", and calling defendant a "domestic terrorist as much as 9/11" and referring to armed robberies in Trenton and Brooklyn and the Bloods Street gang which were not part of this case.

ECF No. 20 at 22-23 (internal citations omitted).

"The Supreme Court has held that prosecutorial misconduct is insufficient to overturn a conviction unless it 'so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process.'" Reid v. Beard, 420 F. App'x 156, 159 (3d Cir. 2011) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) (alteration in original)).  "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned.  The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (internal quotation marks omitted).[11]

"In evaluating whether the remarks of the prosecutor rise to the level of a constitutional violation, we are required to examine those remarks in the context of the whole trial." Werts v. Vaughn, 228 F.3d 178, 198 (3d Cir. 2000).  The Court "must examine the prosecutor's offensive actions in context and in

---

[11] Although the Appellate Division cited to state law for its review of Petitioner's prosecutorial misconduct claims, New Jersey case law is consistent with the federal standard for assessing prosecutorial misconduct.  See Laurance, 2014 WL 8481101, at *13 ("[I]n order to justify reversal, the misconduct must have been 'so egregious that it deprived the defendant of a fair trial.'" (quoting State v. Smith, 770 A.2d 255, 269-70 (N.J. 2001))).  See also Marshall v. Hendricks, 207 F.3d 36, 69 (3d Cir. 2002).

light of the entire trial, assessing the severity of the
conduct, the effect of the curative instructions, and the
quantum of evidence against the defendant." Moore v. Morton,
255 F.3d 95, 107 (3d Cir. 2001). "There was no objection at any
point during the opening statement. All of the items shown to
the jury were eventually admitted into evidence, as was
defendant's statement, and there was testimony during trial
regarding defendant's aliases. When the evidence was actually
adduced at trial, there was no objection." Laurance, 2014 WL
8481101, at *14. Additionally, the trial court instructed the
jury that opening arguments were not evidence:

> In the opening statement, the prosecutor will present
> the State's contentions and will outline what he expects
> to prove. Following that, defense counsel will make his
> opening statement. What is said in an opening statement
> is not evidence. The evidence will come from the
> witnesses who will testify and from whatever documents
> or tangible items that are received in evidence.

6T6:25 to 7:7. The jury knew that it was not to rely on the
attorneys' arguments, and all of the evidence mentioned during
opening was presented to the jury for its consideration during
trial. Viewed in context, the Appellate Division did not
violate or unreasonably apply federal law in reaching its
decision.

"The AP asked Mrs. Burshteyn's friend and associate
Valadamir Laskin whether he recognized a photograph of the
victim's young granddaughter." ECF No. 11 at 110 (citing

6T195:19 to 197:19).  Prior to Laskin's testimony, trial counsel
objected to the admission of the photograph because "clearly the
picture of this little child is going to certainly engender
sympathy . . . ."  6T187:22-23.  The trial court agreed and held
the picture could not be shown to the jury.  6T189:8-11.
However, it permitted the state to show Laskin the photograph
"for identifying information and laying foundation for whose
phone it is."  6T189:9-11.  The jury was never shown the
photograph; the witness was only asked to confirm the picture
was the victim's granddaughter to support the state's claim that
the phone, which Petitioner had in his possession when he was
arrested, belonged to the victim.  The Appellate Division
concluded this claim was without merit, and this decision does
not contradict federal law and is not unreasonable in light of
the facts at trial.

Petitioner also objects to Hageman's testimony that "the
police locate[d] defendant's girlfriend in law enforcement
database."  The state asked Hageman if Wilson had "reach[ed] out
to anybody from the Burlington County Prosecutor's Office and
say I have some valuable information, I'd like to speak to you
folks?", and Hageman testified she had not.  19T11:14-20.  The
state then asked how detectives located Wilson, to which Hageman
responded: "We checked through some law enforcement databases,
came up with a few addresses, ultimately we found her and

located her" at her workplace in the Philadelphia Airport.
19T11:23 to 12:2.  Petitioner provides no support for his claim
that this brief mention of law enforcement databases "so
infected the trial with unfairness as to make the resulting
conviction a denial of due process." Donnelly v. DeChristoforo,
416 U.S. 637, 643 (1974).  Thus, this Court does not find that
the state courts' adjudication of this claim was contrary to, or
an unreasonable application of, clearly established federal law.

Petitioner's claim that the state "assert[ed] the defense
conceded felony murder" in its closing argument is likewise
meritless.  Trial counsel, Mr. Riley, ended his closing argument
by attempting to anticipate what the state would tell the jury
by referring to himself in the third person:

> The State has an obligation, it's a constitutional
> obligation to prove each and every element of the offense
> beyond a reasonable doubt.  [The prosecutor] is going to
> tell you a lot of what Mr. Riley said is true, however,
> Mr. Riley didn't tell you, it doesn't matter who did the
> shooting, Kareem Harrison could have shot the lady, it
> could have been anybody.  Mr. Riley wasn't honest with
> you when he said that.  Well, Mr. Riley was honest with
> you. If [Petitioner] was there, then he's guilty of
> felony murder.  Who puts him there? People that you
> cannot trust. Interviews that you cannot trust. And the
> fact that Kareem Harrison is the trigger man and lied
> and lied and lied and lied including coming here and
> lying to you, I suggest to you that the value of his
> evidence is zero.  And when I said to you earlier on,
> the strength of the State's case is built on shifting
> sands, very weak foundation, that's what I'm talking
> about.

44

20T90:5-22.  Trial counsel did not tell the jury that Petitioner was guilty of felony murder.  Trial counsel said the law was clear that "[i]f he was there, then he's guilty of felony murder."  He then argued that the only people who put Petitioner at the scene were lying.  The state's later statement, "[trial counsel] concedes – he conceded in his opening and he's conceded in his summation the felony murder law is clear," 20T94:21-23, simply refers back to trial counsel's argument.  The state never told the jury that trial counsel conceded Petitioner was guilty of felony murder.  The Appellate Division concluded this claim was without merit, and this decision does not contradict federal law and is not unreasonable in light of the facts at trial.

Petitioner also claims the state's mention of dual sovereignty was misconduct:

> Forget about the Commonwealth of Pennsylvania.  Some of the crimes start there, we talked about in my opening concurrent jurisdiction, dual sovereignty. This crime started in Pennsylvania, came into New Jersey.  They kidnapped her together.  They are responsible together, complicit together for the conduct of each other as the judge will explain the law to you.  And it's not — if anything that I say is in conflict with what Judge Covert says, please, accept Judge Covert, her instructions to you.

20T97:19 to 98:4.  Petitioner makes no argument as to how this statement so infected his trial with unfairness and denied him due process, and the Court sees none on the record before the Court.  The state courts' adjudication of this claim was not

45

contrary to, or an unreasonable application of, clearly
established federal law.

Petitioner further claims that the presentation of a video
during sentencing was prosecutorial misconduct.  "The prosecutor
asked the judge to permit presentation of a video-recording
prepared by Burshteyn's family that showed aspects of her life.
The judge reviewed the recording, which was two minutes and
forty-seven seconds long, and found that, with the music muted,
it complied with the requirements of State v. Hess, 207 N.J.
123, 156-59 (2011).  The video was played at sentencing."
Laurance, 2014 WL 8481101, at *16; 24T3:13-25.

"At sentencing, 'a convicted criminal is entitled to less
process than a presumptively innocent accused.'  Thus, a
sentencing judge may consider information, 'largely unlimited'
as to kind or source, that would be inadmissible at trial."
United States v. Paulino, 996 F.2d 1541, 1547 (3d Cir. 1993)
(quoting United States v. Mobley, 956 F.2d 450, 455 (3d Cir.
1992)).  "Victim impact evidence is simply another form or
method of informing the sentencing authority about the specific
harm caused by the crime in question, evidence of a general type
long considered by sentencing authorities."  Payne v. Tennessee,
501 U.S. 808, 824-25 (1991).  "In the majority of cases, and in
this case, victim impact evidence serves entirely legitimate
purposes.  In the event that evidence is introduced that is so

unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." Id. at 825.

New Jersey permits the use of victim impact evidence at sentencing so long as it is "factual, not emotional, and [is] free of inflammatory comments or references." State v. Muhammad, 678 A.2d 164, 180 (N.J. 1996). It prohibits victim impact evidence that has "the great capacity to unduly arouse or inflame emotions." State v. Hess, 23 A.3d 373, 394 (N.J. 2011). This is consistent with federal law, and Petitioner has not presented any evidence from which the Court could conclude that the video presentation to the sentencing court was unduly prejudicial. Accordingly, the Court cannot conclude that the Appellate Division's adjudication of this matter was an unreasonable application of Supreme Court precedent or contrary to clearly established Supreme Court precedent.

"During his presentation, the prosecutor likened defendant to a 'domestic terrorist,' and alluded to armed robberies he allegedly committed in Trenton and Brooklyn, as well as references defendant himself made during his statement to Hageman regarding participation in the 'Bloods criminal street gang.'" Laurance, 2014 WL 8481101, at *16. The Appellate Division concluded that "the prosecutor's comments, while hard-edged, do not require reversal. Information cited by the

prosecutor regarding other crimes were reflected in the record, including defendant's unredacted statement to authorities." Id. at 17. "It is clear that to the extent they were inflammatory, the prosecutor's rhetoric had no effect on the judge's thoughtful consideration of the sentence to be imposed." Id.

The Court concludes the Appellate Division reasonably concluded that the remarks were harmless error. The prosecutor did not make these arguments to the jury, and the sentencing court made clear it was Petitioner's "heinous, depraved and harmful" actions in this case, not the prosecutor's remarks, that drove the sentence. 24T52:1-15, 55:13-19. It rejected the prosecutor's argument that Petitioner's self-admitted gang affiliation showed involvement in organized criminal activity. 24T55:15-16 (rejecting aggravating factor five). The sentencing court also properly considered Petitioner's prior criminal record and post-arrest conduct towards Wilson in finding a future propensity for violence, making no mention of the uncharged crimes. 24T54:13-25. The Court concludes that the Appellate Division's harmless error determination was not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.

The Court has previously discussed and found no justification for relief under § 2254 based on the admission of Petitioner's letters to Wilson, Walker's testimony, other crime

evidence, and Petitioner's statement to police.  It follows that the Appellate Division reasonably concluded there was no prosecutorial misconduct associated with the admission of the evidence or comments on the evidence admitted at trial.

Finally, the Appellate Division vacated Petitioner's certain persons conviction.  Laurance, 2014 WL 8481101, at *19. Petitioner's challenge to the prosecutor's failure to present the jury with a certified judgment of conviction for the predicate offense is moot.

E.   Sufficiency of the Evidence

Petitioner argues "[t}he proofs presented before the jury were insufficient to establish the offense of certain persons not to have weapons."  This claim is moot because the Appellate Division vacated this conviction on direct appeal.  The Court cannot grant Petitioner further relief on this claim.

F.   Sentencing

Petitioner argues the sentencing court failed to merge his second-degree robbery and aggravated assault convictions.  He also argues the sentence is manifestly excessive.  "[A] federal court's ability to review state sentences is limited to challenges based on 'proscribed federal grounds such as being cruel and unusual, racially or ethnically motivated, or enhanced by indigencies.'"  Rollins v. Slaughter, No. 19-13390, 2022 WL 2358387, at *17 (D.N.J. June 30, 2022) (quoting Grecco v.

O'Lone, 661 F. Supp. 408, 415 (D.N.J. 1987)).  "Thus, federal courts may not review a challenge to a state court's discretion at sentencing unless it violates a separate federal constitutional limitation."  Id. (citing Pringle v. Court of Common Pleas, 744 F.2d 297, 300 (3d Cir. 1984)).

"The Eighth Amendment, which forbids cruel and unusual punishments, contains a 'narrow proportionality principle' that 'applies to noncapital sentences.'"  Ewing v. California, 538 U.S. 11, 20 (2003) (citations omitted).  "A court must consider three proportionality factors when evaluating Eighth Amendment challenges: (1) the gravity of the offense and the harshness of the penalty; (2) the sentences imposed on other criminals in the same jurisdiction; and (3) the sentences imposed for commission of the same crime in other jurisdictions."  United States v. Burnett, 773 F.3d 122, 136 (3d Cir. 2014) (citing Solem v. Helm, 463 U.S. 277, 290-92 (1983)).  "In conducting this analysis, a court grants substantial deference to legislative decisions regarding punishments for crimes."  Id.

"The first factor acts as a gateway to the proportionality inquiry.  The Eighth Amendment only forbids sentences that are 'grossly disproportionate' for a conviction for the crime involved."  Rollins, 2022 WL 2358387, at *17.  Petitioner received "an aggregate term of life imprisonment plus forty years, subject to ninety-four and one-quarter years of parole

ineligibility." Laurance, 2014 WL 8481101, at *1.  New Jersey authorizes a life sentence for first-degree felony murder, which is only one of the crimes of which Petitioner was convicted. N.J.S.A. § 2C:11-3(b)(1) ("Murder is a crime of the first degree but a person convicted of murder shall be sentenced . . . by the court to a term of 30 years, during which the person shall not be eligible for parole, or be sentenced to a specific term of years which shall be between 30 years and life imprisonment of which the person shall serve 30 years before being eligible for parole.").

"Generally, a sentence within the limits imposed by statute is neither excessive nor cruel and unusual under the Eighth Amendment."  United States v. Miknevich, 638 F.3d 178, 186 (3d Cir. 2011).  Petitioner's life sentence is within the statutory limit for his felony murder conviction, and courts in this District have found that life sentences are not grossly disproportional for felony murder convictions.  See Wilson v. Cathel, No. 04-4705, 2006 WL 3796863, at *10 (D.N.J. Dec. 21, 2006) (finding that a life sentence for felony murder did not rise to the level of disproportionality that violates the Eighth Amendment); Peoples v. Cathel, No. 05-5916, 2006 WL 3419787, at *12 (D.N.J. Nov. 21, 2006) (same).  If Petitioner's life sentence is proportional for his felony murder conviction alone, then it follows that it is proportional when his other

convictions are considered.  "If the petitioner fails to
demonstrate a gross imbalance between the crime and the
sentence, a court's analysis of an Eighth Amendment challenge
ends."  Rollins v. Slaughter, No. 19-13390, 2022 WL 2358387, at
*17 (D.N.J. June 30, 2022).  "Thus, although the Appellate
Division addressed Petitioner's sentencing claims under the lens
of state law, its reasoning was neither contrary to, nor an
unreasonable application of, clearly established federal law."
Id. at *18.  The Court will deny habeas relief on this claim.

G.   Cumulative Error

Petitioner alleges the cumulative errors at trial deprived
him of a fair trial.  "Cumulative errors are not harmless if
they had a substantial and injurious effect or influence in
determining the jury's verdict, which means that a habeas
petitioner is not entitled to relief based on cumulative errors
unless he can establish 'actual prejudice.'"  Albrecht v. Horn,
485 F.3d 103, 139 (3d Cir. 2007) (quoting Brecht v. Abrahamson,
507 U.S. 619, 637 (1993)).  The Court has reviewed the Appellate
Division's decision with the appropriate AEDPA deference and
concludes the decision was not contrary to or an unreasonable
application of federal law as determined by the Supreme Court.
The decision was also reasonable based on the facts at trial.
"Petitioner has (i) failed to cast doubt over the proofs of his
guilt, and (ii) failed to establish that he has suffered any

prejudice from the purported errors.  Thus, Petitioner has not proven that the alleged cumulative errors had 'a substantial and injurious effect or influence in determining the jury's verdict.'" Thomas v. Johnson, No. 18-0710, 2022 WL 603002, at *28 (D.N.J. Mar. 1, 2022) (quoting Fahy v. Horn, 516 F.3d 169, 205 (3d Cir. 2008), certificate of appealability denied sub nom. Thomas v. Adm'r New Jersey State Prison, No. 22-1540, 2022 WL 4363552 (3d Cir. Aug. 30, 2022).  The Court will deny habeas relief on this ground.

H.    Ineffective Assistance of Counsel[12]

Petitioner's final claim is that his felony murder, robbery, kidnapping, and carjacking convictions must be reversed "because trial counsel did not object[] during the Court's instruction to the jury, which included several instances of 'and/or' terminology in describing crimes for which a jury can find a defendant guilty of a substantive offense and crimes for

---

[12] "[T]he federal role in reviewing an application for habeas corpus is limited to evaluating what occurred in the state or federal proceedings that actually led to the petitioner's conviction; what occurred in the petitioner's collateral proceeding does not enter into the habeas proceeding." Hassine v. Zimmerman, 160 F.3d 941, 954 (3d Cir. 1998) (emphasis omitted).  Accordingly, the Court limits its review to Petitioner's ineffective assistance of counsel claim and does not consider Petitioner's argument that the PCR court erred by failing to conduct an evidentiary hearing.  See also Lambert v. Blackwell, 387 F.3d 210, 247 (3d Cir. 2004)("alleged errors in [state] collateral proceedings ... are not a proper basis for habeas relief").

which a jury can find a defendant guilty via co-conspirator liability." ECF No. 20 at 32. The PCR court denied this claim without an evidentiary hearing on October 20, 2016. ECF No. 11-22. The Appellate Division affirmed substantially for the reasons set forth by the PCR court. State v. Laurance, No. A-2290-16T1, 2018 WL 2122726, at *2 (N.J. Super. Ct. App. Div. May 9, 2018).

The state courts correctly identified Strickland v. Washington, 466 U.S. 668 (1984) as the governing standard for ineffective assistance of counsel claims. See Laurance, 2018 WL 2122726, at *1. To succeed on his claim, Petitioner must "show that counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688 (1984). He must then show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

Furthermore, "[w]hen a federal habeas petition under § 2254 is based upon an ineffective assistance of counsel claim, '[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable,' which 'is different from asking whether defense counsel's performance fell below Strickland's standard.'" Grant v. Lockett, 709 F.3d 224, 232 (3d Cir. 2013) (quoting Harrington v. Richter, 562 U.S. 86, 101

(2011)).  "Federal habeas review of ineffective assistance of counsel claims is thus 'doubly deferential.'"  Id. (quoting Cullen v. Pinholster, 563 U.S. 170, 190 (2011)).

The PCR court, who was also the trial court, conceded it "utilized 'and/or' terminology several times during the jury instructions.  Its usage was identical with respect to each charge, the language changing each time only to accommodate the differing elements."  ECF No. 11-22 at 10.

> As an example, the Court's kidnapping instruction read thusly:
>
> In order for you to find the defendant guilty of kidnapping, the State is required to prove each of the following elements beyond a reasonable doubt: that the defendant, Lenroy Laurance and/or the conduct of another person for which he is legally accountable unlawfully removed Lyudmila Burshteyn from her place of business or a substantial distance from the vicinity where she was found or unlawfully confined Lyudmila Burshteyn for a substantial period.
>
> If you find that the State has proven beyond a reasonable doubt that the defendant and/or the conduct of another person for which he is legally accountable is guilty of kidnapping but you have reasonable doubt as to whether the State has proven that he knowingly harmed Lyudmila Burshteyn or knowingly did not release her in a safe place prior to her apprehension, you should find the defendant guilty of kidnapping in the second degree.
>
> If you find beyond a reasonable doubt that the defendant and/or the conduct of another person for which he is legally accountable is guilty of kidnapping and that he knowingly harmed Lyudmila Burshteyn or knowingly did not release her in a safe place prior to her apprehension, then you should find the defendant guilty of kidnapping in the first degree.

Id.  "The court used 'and/or' in its robbery, carjacking, and
felony murder instructions, using identical language to describe
co-conspirator liability."  Id. at 11.  Petitioner argued the
language was deficient under state law because "the phrase
'and/or' served to confuse the jury by opening the possibility
that a juror could think Defendant conspired or was an
accomplice in a way that he did not act."  Id. at 10.

The PCR court disagreed and concluded there was no error
under state law.  "Here, the Court's use of 'and/or' was limited
to describing the relationship between Defendant's own conduct
and the conduct of others with whom he was in league.  At no
point was 'and/or' used in such a way that would cause confusion
as to which charge the defendant could be guilty of via co-
conspirator or accomplice liability."  Id. at 12.  "The Court
gave separate instructions for each count, and did not conjoin
them . . . .  For this reason, the jury instructions given at
trial provided sufficiently clear and correct guidance to the
jury."  Id. at 12-13.

The PCR court further concluded that even "if Defendant
were to succeed in showing deficient performance under prong one
of Strickland, he could not have succeeded under prong two."
Id. at 13.  "[T]here was very strong and compelling evidence of
Defendant's guilt adduced at trial.  The jury was presented
evidence directly implicating Defendant with committing the

crime, including Defendant's own admission that he was present at the scene of the killing of Ms. Burshteyn during the course of a kidnapping." Id. The Appellate Division agreed with this assessment.

> Although "and/or" was extensively used throughout the instructions, and it did on occasion offer the jury an opportunity to consider two different crimes, our review of the entire jury charge convinces us that the phrase did not create ambiguity or confusion. Given the substantial evidence of defendant's guilt, any error was harmless beyond a reasonable doubt. Therefore, even if trial counsel rendered deficient performance by not objecting, there is no "reasonable probability" that defendant suffered any prejudice.

Laurance, 2018 WL 2122726, at *2.

The Court concludes that the state courts reasonably applied Strickland. As discussed supra, "it is not the role of the federal courts to review state court jury instruction rulings that are based on state law." Howard v. D'Ilio, No. 14-4758, 2018 WL 1014168, at *5 (D.N.J. Feb. 22, 2018). "The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." Henderson v. Kibbe, 431 U.S. 145, 154 (1977). "It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." Id.

57

The trial court explained its use of "and/or" to the jury as part of its instructions on co-conspirator liability:

> [Y]ou've often heard me say the following with regard to the defendant's conduct, I'll make a statement that if you find beyond a reasonable doubt that the defendant, and then I use the phrase and/or the conduct of another person for which he is legally accountable committed the crime of, you've heard me say that.  And that really applies to every one of the crimes outlined in the indictment.
>
> And I'm going to go over co-conspirator liability so that you have an understanding of why that is so. . . . We've already talked about felony murder that that concept attached to it.  So I'm going to go over co-conspirator liability so that you understand that concept as well and why it is that I've used that type of language whenever I refer to the defendant, that really applies to all the charges in the indictment, okay.

21T213:5-23.  "Defendant never asserted that the instructions on coconspirator or accomplice liability were deficient." Laurance, 2018 WL 2122726, at *2 n.2.

The PCR court and the Appellate Division concluded that the use of "and/or" during jury instructions did not violate state law, and this Court has no authority to review that determination under § 2254.  Once the state courts concluded the instruction complied with state law, they reasonably determined that trial counsel did not err by failing to object to the instructions.  Accordingly, the state courts reasonably applied Strickland to Petitioner's ineffective assistance of counsel claim.

The Court further notes that there is no conflict with federal law when the instructions are considered in their entirety.  See Estelle v. McGuire, 502 U.S. 62, 72 (1991) ("It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973))).  The trial court concluded its instructions to the jury with the admonition that its verdict must be unanimous: "You may return on each crime charged a verdict of either not guilty or guilty.  Your verdict, whatever it may be as to each crime charged, must be unanimous. Each of the 12 members of the deliberating jury must agree as to the verdict."  21T219:21-25.  This is sufficient under federal law.  "The court did not . . . need to instruct the jury that it must unanimously agree on the theory of liability, i.e., principal or accomplice."  United States v. Osorio, 757 F. App'x 167, 171 (3d Cir. 2018).  See also United States v. Ferguson, 676 F.3d 260, 279 (2d Cir. 2011) ("[A] jury is unanimous even if some jurors convicted on a theory of principal liability and others on aiding and abetting.").  The entirety of the jury instructions conveyed to the jury the elements of each offense, that it was the state's responsibility to prove each offense beyond a reasonable doubt, and that any verdict had to be unanimous.

The state courts also reasonably concluded that Petitioner did not satisfy Strickland's prejudice prong.

> Here, had [trial counsel] objected to the "and/or" language and it was rephrased, the verdict likely would not have come out differently.  This is not only because the use of "and/or" was not used in the manner in which it was used in [State v. Gonzalez, 130 A.3d 1250 (N.J. Super. Ct. App. Div. 2016] (i.e. creating confusion as to which substantive charge the jury could find a defendant guilty) but because there was very strong and compelling evidence of Defendant's guilt adduced at trial.  The jury was presented evidence directly implicating Defendant with committing the crime, including Defendant's own admission that he was present at the scene of the killing of Ms. Burshteyn during the course of a kidnapping.

ECF No. 11-22 at 13; see also Laurance, 2018 WL 2122726, at *2 (noting there was "substantial evidence of defendant's guilt"). This is a reasonable conclusion based on the facts at trial, and the state courts reasonably applied Strickland in making their determinations.  Accordingly, the Court will deny habeas relief on this claim.

IV.  CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right."  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that

60

jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 327 (2003).

For the reasons expressed above, Petitioner has failed to make a substantial showing that he was denied a constitutional right. As jurists of reason could not disagree with this Court's resolution of the claims, the Court will deny Petitioner a certificate of appealability.

V. CONCLUSION

For the foregoing reasons, the Court will deny the second amended petition for writ of habeas corpus under 28 U.S.C. § 2254. A certificate of appealability will not issue.

An appropriate order will be entered.


Dated:_____          _____
At Camden, New Jersey           NOEL L. HILLMAN, U.S.D.J.